UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

EDWARD HERRING AND RENEE
HERRING,

    Plaintiffs,

v.

BERKSHIRE HATHAWAY HOMESTATE
INSURANCE COMPANY, LINDA BINKLEY
D/B/A DOUBLE L PRODUCE; J.L.
BINKLEY & SONS, INC.; JERRY L.
BINKLEY; ABC CORP. ; XYZ CORP
AND JOHN DOE,

    Defendants.

CIVIL ACTION FILE
NUMBER: 1:18-cv-04711-WMR

## **DEFENDANTS BERKSHIRE HATHAWAY HOMESTATE INSURANCE COMPANY, LINDA BINKLEY D/B/A DOUBLE L PRODUCE, AND JERRY BINKLEY'S BRIEF IN SUPPORT OF THEIR DAUBERT MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT BRIAN J. STEVENS**

Defendants Berkshire Hathaway Homestate Insurance Company ("BHHIC"), Linda Binkley d/b/a Double L Produce ("Double L"), and Jerry Binkley are entitled to an order excluding the testimony of Plaintiffs' commercial trucking industry expert Brian J. Stevens ("Stevens") on the following grounds:

## I.    <u>STATEMENT OF PERTINENT FACTS</u>

This personal injury action arises from a wreck on I-75 on July 15, 2017 in Bartow County, Georgia.  Plaintiff Renee Herring and Defendant Jerry Binkley were the drivers involved in the wreck.  Plaintiff Edward Herring was the front-seat passenger in the vehicle driven by Renee Herring.

Jerry Binkley was operating a 2003 Freightliner for Double L as a commercial driver when he changed lanes and hit the Chevrolet causing Plaintiff Renee Herring to lose control. Defendants admitted Mr. Binkley is at fault for causing the collision during Jerry Binkley's June 5, 2019 deposition.

Jerry Binkley did not take a drug and alcohol test after the collision on July 15, 2017 because he did not know he was required to do so.

Corporal Michael Hall of the Georgia State Patrol investigated the July 2017 wreck and prepared a report. All Georgia State Troopers are trained in DUI countermeasures, and Corporal Michael Hall's report reflects he did not suspect that Jerry Binkley was fatigued or under the influence of drugs or alcohol. If Corporal Hall suspected Mr. Binkley was under the influence, he would have requested testing, but he did not do so.

Corporal Hall determined Mr. Binkley was not distracted and the only contributing factor was "Failure to Keep in Proper Lane." There is no evidence Jerry Binkley was fatigued at the time of the July 15, 2017 collision. Mr. Binkley's driver logs for July 14 and 15, 2017 show he was well within the hours of service regulations and there is no evidence he was fatigued.

Linda Binkley owned Double L, which was a sole proprietorship and Mrs. Binkley worked as Double L's secretary and treasurer. Jerry Binkley owned Double L with his wife. Jerry

Binkley drove for Double L as its only commercial driver from July 2014 through December 8, 2018.

Prior to Double L, Jerry Binkley was the owner of Defendant J.L. Binkley & Sons, Inc. ("Binkley & Sons"). At that time, Jerry Binkley drove as a commercial driver under the FMCSA's operating authority for Binkley & Sons from 1996 through 2013.

While driving for Binkley & Sons, Jerry Binkley was involved in a wreck in March 2013 in Cobb County, Georgia. Mr. Binkley did not take a drug and alcohol test after the March 2013 wreck because he did not know he was required to do so.

At the time of the focal wreck on July 15, 2017, Jerry Binkley had a medical examiner's certificate from a DOT physical examination done on February 11, 2016.

Jerry Binkley's doctor diagnosed him with a tremor disorder approximately 15 years ago.  Jerry Binkley began taking Sinemet for his tremors in about 2011 and he continued to take Sinemet as of July 15, 2017.

Jerry Binkley has never experienced fatigue, dizziness or any side effect as a result of taking Sinemet. No doctor has told Jerry Binkley that he should not drive a commercial vehicle while taking Sinemet.  In fact, no doctor ever told Mr. Binkley in his 50 plus years as a truck driver he should drive less because of any physical impairment.

The medical examiner who performed Jerry Binkley's medical certification examination on February 11, 2016 knew had a written notice that Jerry Binkley had a long-standing history of "benign essential non-progressive tremors" and he (Binkley) was taking Sinemet regularly.

Several months after the medical certification examination on February 11, 2016, Jerry Binkley's pain specialist Dr. Larry Zhou first prescribed Norco to Jerry Binkley for low back pain in early February 2017. Jerry Binkley has experienced episodes of back pain in the past four to five years.  He began treatment with Dr. Zhou for low back pain in late December 2016.

Jerry Binkley's last visit with Dr. Zhou before the July 15, 2017 collision was May 5, 2017.  Dr. Zhou's report from this appointment reflects Jerry Binkley was not having any side effects when taking Norco and the medication helped him sleep.  Mr. Binkley was taking the Norco as prescribed and he denied overuse, misuse, abuse of pain medicine, or doctor shopping.

Inexplicably, Jerry Binkley testified that his primary care doctor, Dr. Joseph Beaven, recommended a CPAP machine to address his snoring about three to four years ago but did not diagnose him with sleep apnea.  Dr. Beaven testified he did not recall ever having a conversation with Jerry Binkley about a CPAP machine and never treated him (Binkley) for sleep apnea symptoms.

## II. <u>BRIAN STEVENS' RULE 26 REPORT AND TESTIMONY</u>

On November 19, 2019, Plaintiffs filed their Second Supplement to their Initial Disclosures, which named Brian J. Stevens ("Stevens") of Napier Diversified Services, Inc. as their expert and provided a copy of his Rule 26 report. (Docs. 49 and 49-2). Plaintiffs presented Stevens as an expert knowledgeable in the commercial motor vehicle industry and its standards of care concerning "drivers qualifications, driving training, driver supervision, driving procedures, driving competence, driving records of duty status, and record keeping as well as general standards in the trucking industry." (Doc. 49, pg. 3 of 5 of Attachment B). Stevens' CV references his experience in different capacities within the commercial trucking industry for more than 20 years. (Doc. 49-1, pg. 3 of 3).

### A. <u>"Chameleon Carrier"</u>

In his Rule 26 report, Stevens states Double L and Jerry Binkley created a "chameleon carrier" when applying for Double L's operating authority after ceasing Binkley & Sons' operations. He asserts that "[t]he [trucking] industry understands the FMCSA to consider obtaining multiple operating authorities as an attempt to hide or disguise past poor safety history." (Doc. 49-2 at pg. 14). He explains that carriers or individuals may apply for new or separate FMCSA operating authorities under new names to allow "…for a [motor] carrier to hide or mislead those who may need to consider

the safety performance history of a given carrier." (Doc. 49-2 at pg. 14).

In support his opinion, Stevens points to Jerry Binkley's March 2013 wreck with Binkley & Sons. In the Rule 26 Report, Stevens cites Jerry Binkley testimony that Binkley & Sons' insurance increased after this wreck and that it ceased operation. (Doc. 49-2 at pg. 15).  Thereafter, Double L and Jerry Binkley applied to FMCSA for Double L's operating authority in 2014. (Doc. 49-2 at pg. 15). Stevens asserts **"[t]he steps taken by [Jerry] Binkley and Linda Binkley in creating [a] "chameleon carrier"** would be of great concern to the FMCSA." (Doc. 49-2 at pg. 15).

During his deposition on January 28, 2020, Stevens admits he has not reviewed any documentation or information giving him any indication Double L tried to hide or mislead concerning the March 2013 wreck. (Depo. of B. Stevens, Exh. A to Brief on Daubert Motion, pg. 91, l. 13 - 20). Still, Stevens expressed an opinion that Double L and Jerry Binkley sought to hide information about the 2013 wreck and the failure to perform a post-accident drug and alcohol test afterward. (Depo. of B. Stevens, Exh. A to Brief on Daubert Motion, pg. 85, l. 13 - 25).

Stevens explained his understanding of a chameleon carrier. He quoted a December 13, 2011 article from the FMCSA Federal Register, which he referenced in footnote 19 in his Rule 26 Report:

"The FMCSA has determined that a number of motor carriers have submitted new applications for registration often under a new name in order to continue operating after having been placed out of service for safety-related reasons, to avoid paying civil penalties, to circumvent denial of operating authority based on determination they were not fit, willing or able to comply with applicable statutes or regulations, or to otherwise avoid a negative compliance history… The practice of "reincarnating" as a new carrier or operating affiliated companies to avoid a negative compliance history of enforcement action creates an unacceptable risk of harm to the public…"

(Depo. of B. Stevens, Exh. A to Brief on Daubert Motion, pg. 44, l. 5 - 19; pg. 45, l. 1 – 6). Stevens agrees the FMCSA is empowered to identify chameleon carriers, and he is aware the FMCSA enforces disciplinary action against such carriers. (Depo. of B. Stevens, Exh. A to Brief on Daubert Motion, pg. 57, l. 24 – 25; pg. 58, 1 – 10).

Stevens admits there were no known disciplinary actions taken by the FMCSA to limit, cancel or revoke Binkley & Son's operating

authority from 1996 through 2013, including in relation to the March 2013 wreck. (Depo. of B. Stevens, Exh. A to Brief on Daubert Motion, pg. 75, l. 12 – 17). Stevens admits there were no known pending civil penalties or fines against Binkley & Sons when Double L applied for authority in 2014. (Depo. of B. Stevens, Exh. A to Brief on Daubert Motion, pg. 70, l. 18 – 25). Further, Stevens admits there were no known pending FMCSA enforcement orders against Binkley & Sons when Double L applied for authority. (Depo. of B. Stevens, Exh. A to Brief on Daubert Motion, pg. 65, l. 21 – 25; pg. 66, l. 1). Despite this, Stevens doubled-down on his opinion that Double L constitutes a chameleon carrier:

> Q:   …So is it fair to say that based on what you've reviewed you're not aware of any [FMCSA] order which was against J.L. Binkley & Sons at the time that Linda Binkley applied for new operating authority?
>
> A:   (Stevens) I'm not aware of any order. All I'm aware of… is the testimony of Mr. Binkley and why he said they created a new motor carrier. It was because his insurance went up… [and he] set up a new carrier. That's all I can tell you. **That in and of itself meets the definition of**

> **a chameleon carrier or a reincarnated carrier."**

(Depo. of B. Stevens, Exh. A to Brief on Daubert Motion, pg. 65, l. 21 – 25; pg. 66, l. 1 – 8).

### B. <u>Jerry Binkley's Medical Certificate</u>

At the time of the focal wreck on July 15, 2017, Jerry Binkley had a medical examiner's certificate from a DOT physical examination done on February 11, 2016. In his Rule 26 Report, Stevens alleges Jerry Binkley failed to check "yes" under the "Health History" section of the Medical Certificate Report concerning the following conditions: "any illness or injury in the last 5 years;" "head/brain injuries, disorders or illness;" and "sleep disorders, pauses in breathing with asleep… loud snoring." (Doc. 49-2 at pg. 17).

Stevens admits Jerry Binkley disclosed a letter from his primary care doctor Dr. Beaven divulging his tremor disorder and regular prescriptions for Sinemet; he says there is no indication Jerry Binkley disclosed "his loud snoring and/or undiagnosed sleep apnea" and "back/leg pain." (Doc. 49-2 at pg. 17).

During his deposition, Stevens testified Jerry Binkley should have marked "yes" on the "any illness or injury in the last 5 years" line because of his low back/leg pain. (Depo. of B. Stevens, Exh. A to Brief on Daubert Motion, pg. 126, l. 2 – 15).

Stevens contends Jerry Binkley should have marked "yes" on the "sleep disorders, pauses in breathing with asleep… loud snoring" the line because of his [Binkley's] testimony that Dr. Beaven recommended a CPAP machine for his loud snoring. (Depo. of B. Stevens, Exh. A to Brief on Daubert Motion, pg. 122, l. 2 – 19).

Stevens was unaware that Dr. Beavens testified he had neither recommended a CPAP machine nor treated Jerry Binkley for sleep apnea symptoms. (Depo. of B. Stevens, Exh. A to Brief on Daubert Motion, pg. 121, l. 4 – 16). Stevens says Dr. Beaven's testimony does not affect his opinion. (Depo. of B. Stevens, Exh. A to Brief on Daubert Motion, pg. 121, l. 17 – 22).

Stevens cannot state whether the conditions at issue would have affected Jerry Binkley's medical qualification on February 11, 2016 but asserts Mr. Binkley did not "self-certify" all information for the medical examiner to consider. (Depo. of B. Stevens, Exh. A to Brief on Daubert Motion, pg. 126, l. 14 = 25; pg. 127, l. 1 - 9).

## C. **Reevaluation by Medical Examiner**

In his report, Stevens contends Jerry Binkley was required to undergo a revaluation from a medical examiner "… once he was prescribed medications that would have affected his ability to operate a [commercial motor vehicle]." (Doc. 49-2 at last sentence on pg. 18 – first sentence on pg. 19). Stevens references Jerry

Binkley's prescriptions for both Sinemet and Norco and alleges "Binkley knew, or should have known, he should not have been operating the involved CMV, taking multiple medications which could likely affect his ability to remain alert." (Doc. 49-2 at pg. 18). Stevens summarizes a list of potential side effects for both medications which he obtained from "Drugs.com" and "WebMD.com." (Doc. 49-2 at pg. 18).

During his deposition, Stevens notes that Jerry Binkley received a prescription for Norco in 2017 after his medical certification examination on February 11, 2016. (Depo. of B. Stevens, Exh. A to Brief on Daubert Motion, pg. 130, l. 10 – 18). Stevens argues that because of the combination of these two prescription medications, "a motor carrier having actual knowledge of a driver taking any kind of controlled substance that could affect his driving is required to not let the driver drive until he's been evaluated." (Depo. of B. Stevens, Exh. A to Brief on Daubert Motion, pg. 131, l. 14 = 18).

D. **"Refusal to Submit" after March 2013 Wreck**

As stated above, Jerry Binkley drove for Binkley & Sons at the time of his March 2013 wreck. In his report, Stevens highlights that Jerry Binkley did not know 49 C.F.R. § 382.303 required him to take a post-accident drug and alcohol test after the March 2013 accident. (Doc. 49-2 at pg. 20). Stevens contends this resulted in a "refusal to submit" under 49 C.F.R. § 382.211 and

"disqualified" Jerry Binkley from driving a commercial motor vehicle until he completed an approved substance-abuse program. (Doc. 49-2 at pg. 20 and footnote 39). Stevens purports Jerry Binkley was "disqualified" from driving at the time of the focal wreck on July 15, 2017, more than four (4) years later. (Doc. 49-2 at pg. 20).

During his deposition, Mr. Stevens admits there was no change to Mr. Binkley's CDL or driving privileges after the March 2013 wreck and acknowledges Jerry Binkley's CDL was not restricted, limited or revoked as a result of the 2013 wreck. (Depo. of B. Stevens, Exh. A to Brief on Daubert Motion, pg. 165, l. 7 – 13). Stevens stated it was not his opinion that Jerry Binkley drove illegally on July 15, 2017; instead, he opined it violated the standard of care regarding post-accident testing. (Depo. of B. Stevens, Exh. A to Brief on Daubert Motion, pg. 166, l. 1 – 25).

**E. Obstructive Sleep Apnea (OSA)**

In his report, Stevens references Jerry Binkley's testimony that Dr. Beaven recommended a CPAP machine for his snoring; Stevens then leaps to state opinions concerning obstructive sleep apnea. (Doc. 42-2, pg. 20 – 21 in § 6). Stevens asserts OSA results in "…interrupted sleep patterns [that] often correlate to "daytime sleepiness (a terms of art when diagnosing OSA) excess fatigue in those affected CMV drivers." (Doc. 42-2, last sentences in pg. 21).

Steven purports that "Double L Produce and/or Binkley failure to address Binkley's untreated OSA, allowing Binkley to operate the involved CMV without a proper diagnosis and/or treatment, while taking drugs that could exacerbate issues of alertness due to fatigue, are contributing factors for consideration in this matter." (Doc. 42-2, last sentence in § 8 on pg. 22).

Stevens admits he is not aware of any evidence indicating Jerry Binkley was fatigued or impaired at the time of the accident on July 15, 2017. (Depo. of B. Stevens, Exh. A to Brief on Daubert Motion, pg. 175, l. 24 – 25; pg.  176, l. 1 – 8; pg. 181, l. 14 – 24).  Stevens was unaware that Dr. Beavens testified he had neither recommended a CPAP machine for Jerry Binkley nor treated him [Binkley] for sleep apnea symptoms. (Depo. of B. Stevens, Exh. A to Brief on Daubert Motion, pg. 121, l. 4 – 16).  Jerry Binkley has never received a diagnosis for or treatment related to sleep apnea.

### F. <u>Opinions Concerning the July 15, 2017 Wreck</u>

Stevens opines Jerry Binkley failed to operate his commercial vehicle in accordance with reasonable industry standards. (Doc. 42-2, pgs. 22 – 23). In his report, he claims Mr. Binkley failed to both perform a proper visual search and properly manage the space around his commercial motor vehicle. (Doc. 42-2, pg. 23). Stevens asserts "Mr. Binkley's failures to safely maintain control of the involved CMV are indicative of a CMV driver who was either

ill, fatigued, distracted or otherwise impaired." (Doc. 42-2, pg. 23).

Defendants admitted Mr. Binkley is at fault for causing the collision during Jerry Binkley's June 5, 2019 deposition. Stevens admits he is not aware of any evidence indicating Jerry Binkley was fatigued or impaired at the time of the accident on July 15, 2017. (Depo. of B. Stevens, Exh. A to Brief on Daubert Motion, pg. 175, l. 24 – 25; pg. 176, l. 1 – 8; pg. 181, l. 14 – 24).

III. **ARGUMENT AND CITATION OF AUTHORITY**

Federal Rule of Evidence 702 controls the admission of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

As held in Horton v. Maersk Line, Ltd., 2014 U.S. Dist. LEXIS 182403 (S.D.Ga. September 22, 2014), the Supreme Court made it abundantly clear in Daubert v. Merrell Dow Pharms., 509 U.S. 579, 590 (1993) that rule 702 "compels district courts to perform the critical gatekeeping function concerning the admissibility of expert scientific evidence." United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (internal quotation omitted). The

Eleventh Circuit Court of Appeals has explained that district courts fulfill that function by engaging in a three-part inquiry, considering whether

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as to be determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific . . . expertise, to understand the evidence or to determine a fact in issue."

Horton, at *7, *8.

The concepts of qualification, reliability, and helpfulness often overlap. However, they are distinct concepts that courts should be careful not to conflate. Quiet Tech. DC-8, Inc. v. Hurel Debois, UK, Ltd., 326 F. 3d 1333 (11th Cir. 2003; Horton at *8. The proponent of the expert testimony has the burden of establishing these requirements and not the Daubert challenger. McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253 (11th Cir. 2002); Horton at *8.

"Experts may not testify to the legal implications of conduct or tell the jury what result to reach. Rather, the court must be the jury's only source of law, and questions of law are not subject to expert testimony." Commodores Entm't Corp. v. McClary, 879 F.3d 1114, 1128 - 1129 (11th Cir. 2018) (citing Montgomery v. Aetna Cas. & Sur. Co., 898 F.2d 1537, 1541 (11th Cir. 1990) (finding

that expert testimony that insurer had a duty to hire tax counsel was a legal conclusion and should not have been admitted)).

The Eleventh Circuit has held that "expert testimony not relevant to any issue in the case and which would not assist the jury should be excluded." Highsmith v. Tractor Trailer Service, 2005 U.S. Dist. LEXIS 46156 (N.D. Ga. Nov. 21, 2005) (citing United States v. Rouco, 765 F.2d 983, 995 (11th Cir. 1985).

**A. Stevens' Opinion that Defendants Created a "Chameleon Carrier" is Irrelevant to Fact Issues in the Case and Constitute a Legal Conclusion**

Stevens' opinions concerning the Defendants' actions in allegedly "creating a chameleon carrier" will not be helpful or relevant in assisting a jury make relevant fact determinations.

These opinions would not assist a jury in evaluating Plaintiffs' negligence claims against Mr. Binkley and *respondeat superior* claim against Double L, particularly since Defendants admitted Mr. Binkley is at fault for causing the collision.

In his report, Stevens states that the FMCSA would have concerns over Double L's application for new operating authority. Stevens' opinions concerning chameleon carriers would be irrelevant to assist the jury concerning Plaintiff's independent negligence claims against Double L or Plaintiffs' claims for punitive damages or attorneys' fees under O.C.G.A. § 13-6-11. These opinions would not offer relevant information related to

Jerry Binkley's fitness as a commercial driver, his driving history, or his training.

While Stevens references Jerry Binkley's March 2013 wreck with Binkley & Sons as an important factor in his conclusions about Double L's application for new authority, Stevens' opinion itself that Defendants created a chameleon carrier is irrelevant to the claims in the Complaint.

Additionally, Stevens states Double L and Jerry Binkley "created" or met the definition of a chameleon carrier. This opinion is a legal conclusion as opposed to a standard of care opinion. During his deposition, Stevens acknowledged that the FMCSA identifies chameleon carriers and enforces disciplinary action against such carriers[1]. The FMCSA will determine whether a motor carrier is a chameleon/reincarnated carrier based on its uniform standard codified in 49 C.F.R. § 386.73 and take statutory enforcement action, if necessary.

When addressing his understanding of a chameleon carrier, Stevens cited a December 13, 2011 article from the FMCSA Federal Register, which discussed the public harm of the **"practice of "reincarnating" as a new carrier or operating affiliated companies to avoid a negative compliance history of enforcement action**…"

---

[1] 49 C.F.R. § 386.73 codifies, in part, the FMCSA's uniform standard for identifying chameleon ("reincarnated") carriers and enforcement provisions to address them.

Stevens admits he is unaware of any disciplinary actions taken by the FMCSA to limit, cancel or revoke Binkley & Son's operating authority from 1996 through 2013, including in relation to the March 2013 wreck. Stevens admits there were no known pending civil penalties, fines, or FMCSA enforcement orders against Binkley & Sons when Double L applied for authority in 2014.  Yet, Stevens' opinions function to direct a jury to a legal conclusion when the evidence does not demonstrate Double L or Jerry Binkley sought to avoid a negative compliance history of FMCSA enforcement action.

Based on the foregoing, Stevens' opinions on this issue should be excluded because they are irrelevant and constitute a legal conclusion.

**B. Stevens' Opinions Concerning Jerry Binkley's Medical Certification and Need for Reevaluation Are Irrelevant to Fact Issues in the Case**

There is no evidence indicating Jerry Binkley's back/leg pain, his loud snoring/CPAP recommendation, or his prescription medications had any role in or contribution to the July 15, 2017 wreck. Stevens' opinions about Jerry Binkley's alleged failure to self-certify medical information about his back/leg pain and loud snoring/CPAP recommendation will not be helpful or relevant in assisting a jury make relevant fact determinations. The same is true about his opinions that Jerry Binkley should have been reevaluated after receiving a prescription for Norco in 2017.

Stevens admits he is not aware of any evidence indicating Jerry Binkley was fatigued or impaired at the time of the accident on July 15, 2017.  Neither Plaintiff testified that Mr. Binkley appeared fatigued or impaired in any way, and there is no testimony to the contrary.

Corporal Michael Hall's report reflects he did not suspect that Jerry Binkley was fatigued or under the influence of drugs or alcohol. If Corporal Hall suspected Mr. Binkley was under the influence, he would have requested testing, but he did not do so. Corporal Hall determined Mr. Binkley was not distracted and the only contributing factor was "Failure to Keep in Proper Lane."

Stevens' opinions related to these issues would be irrelevant to the fact issues decided by a jury and should be excluded.

**C. Stevens' Opinions about "Refusal to Submit" after the March 2013 Wreck are Irrelevant and Should Be Excluded or, in the alternative, They Should be Limited**

Stevens' opinions concerning Mr. Binkley's "disqualification" based on a refusal to submit to testing under 49 C.F.R. § 382.303 for the March 2013 wreck will not be helpful or relevant in assisting a jury make relevant fact determinations concerning the July 2017 wreck. Double L did not exist at the time of the March 2013 wreck. Any issues concerning Binkley & Sons and Jerry Binkley relating to the 2013 wreck are irrelevant to the claims. See Highsmith v. Tractor Trailer Service, 2005 U.S. Dist. LEXIS 46156 (N.D. Ga. Nov. 21, 2005) (holding plaintiff's contentions that

defendants violated many rules of road, including the safety provisions of the FMCSR, were irrelevant to an award of punitive damages because the violations were unrelated to the proximate cause of the collision).

Concerning automobile accident cases, Georgia courts have not allowed evidence of a violation of the law to support an award for punitive damages where the injury was not the proximate result of the violation of law. See Brooks v. Gray, 262 Ga. App. 232, 233 (Ga. Ct. App. 2003).

As analyzed in Defendants' Brief in Support of their Motion for Partial Summary Judgment, the fact that Mr. Binkley did not know 49 C.F.R. § 382.303 required him to take a post-accident drug and alcohol test after the July 15, 2017 wreck cannot support punitive damages or stubborn litigiousness in accordance with Waldrop v. Golden Coastline Logistics, 2015 U.S. Dist. LEXIS 191462 (N.D. Ga. Mar. 12, 2015). Similarly, it is clear that any issues concerning Binkley & Sons and Jerry Binkley associated with the March 2013 are not related and did not contribute to causing the accident on July 15, 2017.

However, in the alternative, if this Court finds Stevens' opinions on this issue relevant, Defendants request that Stevens is precluded from stating Mr. Binkley was "disqualified" from driving on July 15, 2017.

Stevens admits there was no change to Mr. Binkley's CDL or driving privileges after the March 2013 wreck and acknowledges his CDL was not restricted, limited or revoked in any way because of the 2013 wreck.  Stevens states it was not his opinion that Jerry Binkley drove illegally on July 15, 2017; instead, he opined it violated the standard of care regarding post-accident testing. The term "disqualified" runs contrary to this opinion and the undisputed facts concerning Mr. Binkley's driving privileges on July 15, 2017, and this could mislead a jury on the issue.

D. **Stevens' Opinions Concerning Obstructive Sleep Apnea (OSA) Should Be Excluded Because They are Irrelevant and Address Matters within An Ordinary Layperson's knowledge and understanding**

There is no evidence indicating that Jerry Binkley's loud snoring/CPAP recommendation had any role in or contribution to the July 15, 2017 wreck. Stevens' opinions concerning OSA will not be helpful or relevant in assisting a jury make relevant fact determinations.

Stevens admits he is not aware of any evidence indicating Jerry Binkley was fatigued or impaired at the time of the accident on July 15, 2017.  Neither Plaintiff testified that Mr. Binkley appeared fatigued or impaired in any way, and there is no testimony such an assertion.

Corporal Michael Hall's report reflects he did not suspect that Jerry Binkley was fatigued.

Further, Mr. Binkley's driver logs for July 14 and 15, 2017 show he was well within the hours of service regulations and there is no evidence he was fatigued.

Mr. Binkley testifies he snores loudly but that he had never received a diagnosis or treatment for sleep apnea.  Dr. Beaven testified he did not recall ever having a conversation with Jerry Binkley about a CPAP machine and never treated him (Binkley) for sleep apnea symptoms.

Inexplicably, Mr. Binkley testified Dr. Beaven recommended a CPAP machine. Even considering this fact, there is no evidence that Mr. Binkley suffered from OSA necessitating treatment on July 15, 2017 or any time before that. Stevens' opinions concerning OSA should be excluded as irrelevant.

In addition to being irrelevant, Stevens' opinions concerning OSA are within an average layperson's knowledge and understanding.  Expert opinion testimony is admissible only if it addresses matters that are beyond an average lay person's knowledge and understanding, making the testimony helpful to the jury in understanding complex or confusing information. See United States v. Rouco, 765 F.2d 983, 995 (11th Cir. 1985).

Stevens asserts OSA results in daytime sleepiness and excess fatigue. Steven then purports that Double L and Jerry Binkley failure to address Mr. Binkley's untreated OSA "…while taking drugs that could exacerbate issues of alertness due to fatigue;" he then

labels this as "contributing factors for consideration in this matter."

There is no evidence Jerry Binkley was fatigued or under the influence, so there is a question concerning the speculative nature of Stevens' opinion.  Still, even if there was some evidence of such factors, an ordinary lay person would be knowledgeable about the effects of OSA and how it could effect a commercial driver. Stevens' opinions on OSA should be excluded on this basis as well. See Highsmith, 2005 U.S. Dist. LEXIS 46156 (holding that a doctor's proposed testimony on the increased risk of crashes in elderly drivers is well within the knowledge of an ordinary layperson and would not help the jury in determining relevant fact issues).

### E. Stevens' Opinions Concerning Jerry Binkley's Action at the time of the July 15, 2017 Wreck Are Irrelevant to Fact Issues

Stevens' opinions that Jerry Binkley failed to operate his commercial vehicle in accordance with reasonable industry standards will not be helpful or relevant in assisting a jury make relevant fact determinations.  Defendants admitted Mr. Binkley is at fault for causing the collision during Jerry Binkley's June 5, 2019 deposition.  Stevens admits he is not aware of any evidence indicating Jerry Binkley was fatigued or impaired at the time of the accident on July 15, 2017.

### F. All of Stevens' Opinions Should be Excluded as Irrelevant if this Court Grants Defendants' Motion for Partial Summary Judgment

Defendants have filed a motion for partial summary judgment on Plaintiffs' claims for negligent hiring, training, retention, supervision, training, and entrustment, negligence per se, and punitive damages against Double L and Jerry Binkley and their claims for attorneys' fees under O.C.G.A. § 13-6-11 against BHHIC, Double L and Jerry Binkley.

Defendants admitted Mr. Binkley is at fault for causing the collision during Jerry Binkley's June 5, 2019 deposition. Double L admits the doctrine of *respondeat superior* applies. If this Court grants the motion for partial summary judgment, Stevens' opinions concerning Double L or Binkley's conduct apart from the wreck would not be helpful or relevant in assisting a jury make relevant fact determinations.

## IV. <u>CONCLUSION</u>

Defendants Berkshire Hathaway Homestate Insurance Company Linda Binkley d/b/a Double L Produce, and Jerry Binkley request this Court grant their motion to exclude the testimony of Plaintiffs' commercial trucking industry expert Brian J. Stevens

Respectfully submitted this 24th day of February, 2020.

DENNIS, CORRY, SMITH & DIXON, LLP

/s/ *Grant B. Smith*
GRANT B. SMITH
Georgia bar number 658345

- 24 -

/s/ *Jason S. Stewart*
JASON S. STEWART
Georgia bar number 793252
For the Firm
Attorneys for Defendants Berkshire
Hathaway Homestate Insurance Company,
Linda Binkley d/b/a Double L Produce,
J.L. Binkley & Sons, Inc. and Jerry
Binkley

900 Circle 75 Parkway, Suite 1400
Atlanta, Georgia 30339
(404) 926-3688
(404) 365-0134 Facsimile
gbs@dcplaw.com
jstewart@dcplaw.com

## CERTIFICATE OF SERVICE

I electronically filed this **DEFENDANTS BERKSHIRE HATHAWAY HOMESTATE INSURANCE COMPANY, LINDA BINKLEY D/B/A DOUBLE L PRODUCE, AND JERRY BINKLEY'S BRIEF IN SUPPORT OF THEIR DAUBERT MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT BRIAN J. STEVENS** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

> Ben C. Brodhead, III, Esq.
> Ashley B. Fournet, Esq.
> Brodhead Law, LLC
> 3350 Riverwood Parkway Suite 2230
> Atlanta, GA  30339
> ben@brodheadlaw.com
> ashley@brodheadlaw.com

I served the document by United States mail in a properly-addressed envelope with adequate postage thereon to the following non-CM/ECF participants:  None.

This 24th day of February, 2020.

> /s/ *Jason S. Stewart*
> Jason S. Stewart
> For the Firm

THIS IS TO CERTIFY that, pursuant to LR 5.1B, NDGa., the above document was prepared in Courier New, 12 pt.